## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| **Plaintiff,** | |
| **v.** | **Case No.** |
| JOSEPH A. MEYER, JR. and STATIM HOLDINGS, INC. | |
| **Defendants.** | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), files its complaint and alleges that:

## SUMMARY

1.      Between August 2009 and at least June 2018, Statim Holdings, Inc. ("Statim"), a Georgia-registered investment adviser, and its sole owner and control person, Joseph A. Meyer, Jr. ("Meyer") (collectively "Defendants"), defrauded Arjun, L.P. ("Arjun" or the "Fund"), a private fund that they managed, and to which they owed a fiduciary duty, and the investors therein.

2.      Specifically, Statim and Meyer told certain investors that, in return for relinquishing substantial portions of their profits, one class of investors would be protected from any loss of principal, and two other classes of investors would receive guaranteed rates of return on their investments.

3.      Meyer and Statim told these investors that their relinquished profits would be transferred to Statim's capital account with the Fund and/or the capital accounts of a fourth shareholder class to collateralize and fund the principal protection and the guaranteed returns during those periods when the Fund incurred losses or had insufficient profits to pay the required returns.

4.      Unbeknownst to investors, Meyer caused Statim to withdraw from the Fund substantially all of the relinquished profits as they were generated, using them to pay his living expenses.  To further his fraud, Meyer had Arjun's fund administrators occasionally record a receivable due from Statim on Arjun's financial statements to deceive investors into believing that Statim was making good on its guarantees and loss protection.

5.      Further, even when, at times, Meyer purported to pay down the receivable, he actually did so by directly or indirectly borrowing money from the Fund.  Thus, the purported guarantees and loss protection were illusory—backed

by nothing other than a receivable that, at times, grew as high as $2.9 million, or 11.5% of Arjun's net asset value.

6.      This conduct operated as a fraud on both Arjun and the investors therein.

7.      Defendants' fraudulent conduct had additional aspects, including misrepresenting Arjun's portfolio holdings, its financial performance, and its assets under management ("AUM") and employing deceptive means to discourage investors from redeeming their investments.

8.      By the conduct detailed in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15.U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2) & (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], and Meyer aided and abetted Statim's violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1), 206(2), and 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder.

## JURISDICTION AND VENUE

9.      The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t & 77v], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) & 78u(e)], and Section 214(a) the Advisers Act [15 U.S.C. § 80b-14(a)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties, and for other equitable relief.

10.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), & 78aa], and Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)].

11.     Defendants, directly and indirectly, have made use of the mails, the means and instruments of transportation and communication in interstate commerce, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in the Complaint.

12.     Venue is proper because certain of the transactions, acts, practices, and courses of business constituting violations of federal securities laws occurred

in the Northern District of Georgia, Meyer resides in the District and resided in this District at the time of the events alleged herein, and Statim has its principal place of business in this District.

13.    Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this Complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## DEFENDANTS

14.    **Statim** is an Atlanta-based, Georgia corporation that has been an investment adviser registered with the State of Georgia and Arjun's general partner and manager since 2007.  In its most recent Form ADV, filed in April 2018, Statim indicated that it manages one client and has $32.9 million of AUM.

15.    **Meyer**, age 52 resides in College Park, Georgia and is the sole owner and president of Statim.  He previously held a Series 65 securities license.

## RELEVANT ENTITY

16.    **Arjun** is a Delaware limited partnership formed as a private fund by Meyer in April 2007.  Shortly thereafter, it initiated a private placement offering and sold interests in Arjun pursuant to the exemptions contained in Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder.  Arjun

is a pooled investment vehicle. Arjun's records indicate that its AUM has never exceeded approximately $45 million. As of December 31, 2017, the date of its most recent audited financial statements, the Fund's net asset value ("NAV") was approximately $32.5 million, with 41% of the NAV deriving from loans to limited partners.

## STATEMENT OF FACTS

*A.*   *Background*

17.   Meyer formed Arjun in 2007 and, by mid-2009, the Fund had approximately 40 investors and a NAV of approximately $10.5 million. Over that period, it lost 36% of its value from trading losses.

18.   Meyer and Statim made the investment decisions for Arjun for compensation and, thus, acted as investment advisers that owed fiduciary duties to that fund.

19.   In an effort to retain existing investors and attract new ones, in August 2009, Meyer amended Arjun's Limited Partnership Agreement ("LPA") and Private Placement Memorandum ("PPM") (collectively, the "Fund Documents") to introduce three new classes of limited partnership interests, which Meyer called, Share Classes A, B, and C. These new share classes supplemented Arjun's

original limited partnership interests, which Meyer began to refer to as "Class R shares"—with the "R" signifying "Regular."

20.    The Fund Documents refer to the amount that each investor has invested in Arjun as that investor's "capital account."

*(i)    Class A Shares*

21.    In Fund Documents or various newsletters that Statim and Meyer sent to existing and potential investors through at least May 2017, Meyer described the Class A as having a no loss of principal "guarantee," which Meyer variously referred to as "No Loss Protection," "Principal Protection," or "Downside Protection."

22.    Under the terms of the Fund Documents, Class A's No Loss Protection is "collateralized solely" by the capital account of Statim, as Arjun's general partner, as well as the capital accounts of the holders of the Class R shares in proportion to the "downside risk" assumed by each with respect to the No Loss Protection.  Moreover, if the holders of Class A shares have net losses of principal at year-end, off-setting amounts equal to those losses are to be transferred from Statim's capital account, and the capital accounts of the Class R holders in proportion to the risk assumed, to the capital accounts of the Class A shareholders to make them whole.

23.     In addition, from 2009 through at least as late as mid-2017, Meyer regularly emphasized in Arjun investor newsletters that the investments of Class A investors were protected against loss by the capital account of Statim.

24.     In exchange for this benefit, Class A investors relinquish 50% of their incremental net profit, which amount is allocated to Statim's capital accounts and the capital accounts of the Class R shareholders—again to the extent the downside risk is shared by them.

25.     Under the terms of the LPA, Statim determines annually whether the holders of the Class R shares shall bear any of the downside risk for the No Loss Protection.  This means, by implication, that Statim can determine what portion, if any of the relinquished profits of Class A shares are shared with the holders of Class R shares.  Class A shareholders also are required to invest for a period of ten years or pay a 50% "redemption" or "withdrawal" penalty to Statim for making an early withdrawal.

*(ii)    Class B and C Shares*

26.     Class B and C shares have guaranteed rates of return.

27.     For Class B, the rate was "guaranteed" at a percentage determined at the time of investment and did not vary during the life of the investment.  Meyer described Class B shares as structured like a bond.

28.     For Class C, the rate was determined based on an tiered interest rate table and could vary over time depending on the size of the investment and whether Statim exercised its discretion to modify the table.  Meyer described Class C shares as structured like a money market fund.

29.     For both shares, the Fund Documents represented that the rate of return was "collateralized solely" by Statim's capital account and the capital accounts of the Class R shareholders in proportion to the "downside risk" each assumed with respect to the guaranteed return.

30.     Like the Class A holders, in exchange for this benefit, the Class B and C shareholders relinquished a portion of their monthly profits, which for each was the amounts in excess of what was needed to pay the required return.  Any excess profits were to be allocated to Statim's capital account and the capital accounts of the Class R shareholders in proportion to the risk assumed by each for guaranteeing the returns.

31.     If the Fund earned insufficient profits to pay the required returns, amounts equal to the required returns were to be transferred from Statim's capital account, and the capital accounts of the Class R shareholders, to the capital accounts of the Class B and C shareholders to make them whole.

32.    Like Class A's No Loss Protection, Statim could determine annually how much of the downside risk was borne by the Class R shareholders and, correspondingly, how much of the relinquished profits were to be shared with them.

33.    Finally, Class B investors, like Class A investors, had a ten year lockup, while Class C investors could withdraw any or all of their investment, though they were limited to two withdrawals a month.

    *(iii)   Allocating Profits and Losses between Statim and Class R Shareholders*

34.    The Fund Documents provided that, on a yearly basis, Statim could elect the extent to which the Class R shareholders bore the risk and reward of the guarantees.  But the Fund Documents delineate no specific process by which this election occurred.

35.    Between August 2009 and at least June 2018 ("the Relevant Period"), Meyer caused Statim to elect yearly to bear all of the downside risk for these benefits, meaning that Statim designated for itself all of the relinquished profits.

36.    Statim never disclosed this election to Arjun investors.  Indeed, the Fund Documents did not require that it do so and, in fact, the only records of Statim's yearly election appear to be communications from Statim to Arjun's

independent auditors noting the election annually and resulting footnotes referring to the election in Arjun's audited annual financial statements.

37.    Arjun's investors never saw these annual audited financial statements because, when the Fund Documents were amended in August 2009, Meyer removed from Arjun's earlier LPA the requirement that Statim provide Arjun investors with copies of annual audited financial statements for the Fund.

38.    Instead, after August 2009, per the Fund Documents, Arjun investors only received copies of the auditor's opinion letter issued upon completion of the Fund's annual audit.

39.    While Arjun investors did not receive copies of the audited financial statements, Meyer and Statim did receive copies of them, along with the auditor's opinion letter.

40.    Additionally, Meyer and Statim received and reviewed the monthly financial statements prepared by Arjun's third party administrators before such financial statements were provided to investors, and Meyer provided feedback to the third party administrators about the information contained on the financial statements.

41.    Following introduction of the new share classes, Arjun's NAV grew significantly.  During the Relevant Period, Meyer offered and sold to investors

approximately $73.9 million of limited partnership interests in Arjun, including at least $67.4 million of Class A, B, and C shares. This includes approximately $54.4 million of Classes A, B, and C shares sold after January 1, 2014.

B.    _No Loss Protection and Guaranteed Returns_

    (i)    *Meyer Repeatedly Withdraws Substantially All Relinquished Profits from Arjun*

42.    Defendants' representations concerning Class A's No Loss Protection and Class B's and C's guaranteed returns were false and/or misleading because, unbeknownst to investors, Defendants rarely if ever allocated the relinquished profits of the three share classes to Statim's capital account during the Relevant Period, and Statim's capital account balance remained at zero throughout substantially all of the Relevant Period.

43.    When the Class A, B, and C shares were introduced in 2009, Meyer made a purposeful decision not to allocate any of the relinquished profits to Statim's capital account or the capital accounts of the holders of the Class R shares.

44.    Instead, Meyer deemed the relinquished profits to be a performance fee, transferring the relinquished profits of Classes A, B, and C shares to an account on Arjun's books that he called "Incentive Allocation" and then withdrawing these funds at his discretion for his personal use.

45.     The Incentive Allocation book entries essentially worked like a see-saw in terms of payables and receivables.  In profitable months, the Incentive Allocation would reflect a payable from Arjun to Statim.  In down months or when Meyer overdrew the performance fee, the Incentive Allocation reflected a receivable due from Statim to Arjun.  This allowed Meyer to withdraw the relinquished profits from Arjun without causing a corresponding decline in the Fund's NAV.

46.     As discussed more fully below, the receivables also allowed Meyer to create the false appearance, including in the account statements to investors, that Statim was making good on No Loss Protection and the guaranteed returns, even though Meyer knew that there was no money in Statim's capital account.

47.     In communications with Arjun's fund administrator and independent auditor, Meyer described and justified Statim's withdrawals, which well exceeded those allowed as the 0.125% management fee, from Arjun as a "performance fee," which he alternately called an "Incentive Fee" or "Incentive Allocation."

48.     No such fee to Statim or Meyer was disclosed to Arjun's investors or authorized under the LPA.  Although the LPA discloses that Statim would receive a management fee of 0.125% of the month-end capital account values of the limited partners, there is no provision for a performance fee.

49.     In addition, since at least October 2011, Statim's Form ADV Part II has explicitly stated that "Statim does not charge any performance-based fees (fees based on a share of capital gains on or appreciation of the assets of a client)."

50.     Statim's Forms ADV were filed with the State of Georgia and provided to all limited partners in the Fund.

51.     From November 2009 through March 2018, Statim withdrew approximately $14.3 million from the Incentive Allocation account, including at least $12.9 million of relinquished profits withdrawn from January 2014 through June 2018, as performance fees.

52.     Because Arjun investors never saw Arjun's audited financial statements following the August 2009 amendments, there were no means by which Arjun investors could calculate how much of Arjun's assets Statim and Meyer were removing.  Arjun investors only saw their individual monthly statements, which in the case of Class A investors never showed a loss and in the case of Class B and C investors always showed a return.  Nothing received by any of the investors in Class A, B, or C shares suggested that their account values or returns were comprised of an unsecured receivable from Statim.

*(ii)    Meyer Uses Receivables from Arjun to Further His Scheme*

53.     Because Meyer, through Statim, typically paid himself all, or virtually

14

all, of the previous month's relinquished profits from Classes A, B, and C shares,

there were no funds available in Statim's capital account to make good on Class

A's No Loss Protection or Classes B's and C's guaranteed returns in those months

when Arjun incurred losses or had insufficient income to pay the required returns.

54.     During those months, Meyer caused Arjun to record an unsecured

receivable from Statim for the amount necessary to fulfill the guarantees.  This

allowed Meyer to deceive investors by portraying on their account statements that,

regardless of Arjun's performance, they had not lost principal in the case of Class

A shareholders or had earned their guaranteed returns in the case of Classes B and

C shareholders.

55.     As a result, even if Arjun had a monthly loss, the capital accounts of

the holders of Class A shares showed no loss of principal and the capital accounts

of the holders of Classes B and C shares still reflected monthly income.

56.     Investors were never told in those months that a portion of their

capital account balance or a portion of their earned income consisted of an

unsecured receivable from Statim, which is essentially a shell entity with minimal

assets.

57.     To the contrary, Meyer made affirmative misrepresentations to

conceal these facts, including in July 2015 telling one prospective investor that

15

Statim regularly conducted actuarial analyses and had in escrow $483 million to backstop the No Loss Protection and the guaranteed returns.

58.     Additionally, at various times during the Relevant Period, the receivable was reduced in one of four ways.

59.     Occasionally, Meyer contributed cash.  In other instances, Meyer waited for the Fund to earn enough profits, and consequently for Classes A, B, and C to relinquish a portion of their profits as required by the Fund Documents, to offset the receivable.

60.     This sometimes took months.  For instance, between March 2015 and October 2015, the receivable grew from $153,819 to a high of $2.9 million, or 11.5% of Arjun's NAV, but Statim made no payments during those months to reduce the receivable.  Instead, the receivable was partially offset in July and October 2015 by $515,987 and $1.3 million, respectively, using the relinquished profits from the Class A, B, and C shares.  Afterwards, the receivable still remained above $1.5 million from October 2015 through the end of January 2016.

61.     For Statim and Meyer, these receivables essentially represented a months-long, unsecured and undisclosed line of credit from the Fund that was interest free.

62.     Third, Meyer took advantage of an additional feature of Arjun created

16

when the Fund Documents were amended in August 2009, namely, the ability for limited partners to borrow money from the Fund. In particular, Meyer took loans directly and indirectly from the Fund, which he then used to reduce the receivable.

63.     In August 2009, the LPA gave Statim the authority to make loans from the Fund at its discretion to a limited partner, secured by the value of the capital account of that limited partner. From August 2009 through December 2015, Meyer—who was himself a limited partner—was by far the most frequent beneficiary of this provision, purportedly taking loans totaling roughly $5.5 million. Few of the purported loans Meyer made to himself or accounts he controlled were actually documented, which Statim required of other limited partners.

64.     Prior to January 2014, in an apparent effort to avoid scrutiny of Statim's withdrawals by his fund administrators and auditors, Meyer used many of these loans to pay down the receivable. For example, in December 2011 Meyer used $226,254 in loan proceeds to reduce the receivable of $553,877 then-owed to Arjun by Statim. Even with this payment, Arjun ended that year with a receivable of $327,623 still owed from Statim. This receivable was not completely offset by new relinquished profits until *nine months* later, in September 2012.

65.     Similarly, in July 2013, Meyer caused Arjun to loan him $900,000 to

cover nearly $800,000 in accrued losses.  By the end of that month, Meyer's loan balance had spiked to approximately $1.2 million, about half of which was unsecured because it was nearly twice as much as his $637,087 balance in his various personal Arjun capital accounts.

66.     Lastly, due to his past over withdrawals of the relinquished profits, in July 2016, the fund administrator forced Meyer, in a one-off transaction, to apply the balance of his personal capital account ($1,208,178) to partially offset the outstanding receivable from Statim.  The remaining balance of the receivable ($89,425) was recorded as a loan from Arjun to Meyer.

*(iii)   Meyer's Deception Surrounding Arjun's 2015 Performance*

67.     Arjun's financial performance in 2015 declined significantly, leading Meyer to engage in additional deceptions.  In a "2015 3Q Update" sent by Meyer on October 10, 2015 to Arjun investors and potential investors, Meyer falsely claimed Arjun had a "+14% [year-to-date] return."

68.     In truth, as of September 30, 2015, Arjun had a year-to-date *loss* of 12%, which Meyer hid from the Fund's investors by booking receivables from Statim for the No Loss Protection and the guaranteed returns.

69.     By September 30, 2015, those receivables totaled an all-time high of $2.99 million.  This amount exceeded Statim's known assets at the time as well as

the combined value of the capital accounts of Meyer and his spouse, which totaled only about $1.1 million.

70.     In response to concerns of Arjun's fund administrator about the receivable's size, Meyer engaged in a series of deceptive transactions to reduce the receivable by taking loans from Arjun under the guise of Meyer's father-in-law, whose banking and investment accounts were under Meyer's complete control.

71.     The father-in-law was Arjun's second largest investor, with a capital account value of $4.2 million as of September 30, 2015.

72.     That he was Meyer's father-in-law and that Meyer had complete control of his financial accounts was never disclosed to Arjun's fund administrator or independent auditor.

73.     Specifically, between November 2015 and June 2016, Meyer caused Arjun to loan a total of $4.3 million to the father-in-law, which funds Meyer moved through a series of transfers from Arjun's account to the father-in-law's personal bank account, to Meyer's and his spouse's personal bank account, to Statim's bank account, and then to Arjun to reduce the receivable due to Arjun from Statim.

74.     These transfers were done in small amounts, typically under $100,000, and frequently more than once a day.

75.     By February 2016, Meyer had succeeded in eliminating the receivable using the loaned funds.

76.     That Meyer had used Arjun's own funds—loaned to his father-in-law and then transferred to him for use to reduce the receivable—and that neither he nor Statim had the wherewithal to pay down the receivable on their own was never disclosed to Arjun's investors, its fund administrator or its independent auditor.

77.     After the receivable had been reduced, between April and June 2016, Meyer withdrew from Arjun the relinquished profits of Classes A, B, and C, transferred those amounts to the father-in-law, and used them to pay down the father-in-law's loans from the Fund.

C.     *Defendants' Other Misrepresentations and Deceptive Conduct*

    (i)     *Portfolio Holdings*

78.     Meyer had online access to Arjun's trading records, was the individual conducting all trades on behalf of Arjun, and made all investment decisions for Arjun.

79.     At various times, Statim and Meyer misrepresented Arjun's portfolio holdings.

80.     For instance, in 2015, Meyer told a prospective investor, among other things, that the majority of Arjun's investments were in U.S. Treasury bonds. This

investor then invested approximately $17.4 million in Arjun.

81.   Subsequently, in August 2016, Meyer, acting through Statim, sent a letter to Arjun's existing and potential investors, stating that "the bulk of our funds are invested in U.S. Treasury bonds . . . allowing us to offer a unique and clearly marketable 'no loss of principal' guarantee for those Class A investors."

82.   However, Arjun account records show that, in August 2016, Arjun owned no Treasury bonds whatsoever, and had not owned *any* Treasury bonds since October 2013.

83.   As of August 31, 2016, Arjun was primarily invested in two higher risk exchange traded funds ("ETF"):  37% in an ETF that seeks three times the daily performance of the S&P 500 Index and 33% in an ETF that tracks the spot price of gold.

*(ii)   Arjun's Performance*

84.   Statim and Meyer also misrepresented Arjun's financial performance in four principal ways.  First, starting in or about January 2012, Meyer began giving the benefit of No Loss Protection to Class A investors on a monthly basis rather than the end-of-the-year basis described in the LPA.  This meant that he provided No Loss Protection to each Class A shareholder's monthly account balance, booking receivables as needed so that Class A investors' accounts never

dropped below their yearly beginning balance.

85.     In or about July 2014, Meyer went one step further and began giving the benefit of No Loss Protection to each Class A investor's account based on a monthly high water mark, *i.e.*, from July 2014 onward, no Class A investor's account would dip below its previous month's ending balance.  Meyer provided this high water mark guarantee by booking a receivable from Statim so that the account value at month-end did not show any loss.

86.     This monthly true-up had the effect of allowing Meyer to more readily misrepresent Arjun's financial performance.

87.     By booking receivables from Statim to the high water mark in every month when Arjun incurred a loss, Meyer effectively excluded those losses from the calculation of Class A shares' monthly and yearly returns.

88.     This effect was most pronounced in 2015 when the account statements Meyer sent to the holders of Class A shares showed a total yearly return of 11.5%. Arjun's records, however, show that Arjun had an overall loss in 2015 of approximately 7.7%—a result hidden from the Class A investors by the booking of receivables in the down months.

89.     Specifically, in the down months, Class A investors' statements showed a return of "+0.0000%," which suggested that they and the Fund had

incurred no loss.  In truth, the Fund recognized a loss in each of the months it reported a zero return.

90.    As a result of the flattening of the monthly returns, the year-end cumulative results for Class A investors included only the months in which there were positive returns; months with a loss—which in 2015 were eight of the twelve months—were simply ignored and not included in the calculation.  Consequently, the entirety of the Class A's yearly profit as presented to investors, i.e., $1.6 million, was false and misleading because it was the result of a $1.7 million receivable booked from Statim.  Moreover, this receivable balance was a portion of the record high $2.99 million receivable that Meyer paid down using loans to his father-in-law, as described above.

91.    Second, through at least August 2016, Statim and Meyer authored and distributed by email misleading monthly, quarterly, and yearly newsletters on Arjun's performance to current and prospective investors.

92.    Through email blasts of those same newsletters, Meyers spread his misrepresentations to the media, including widely known financial news services.

93.    Each newsletter contained the Statim Holdings, Inc. logo, and was written and signed by Meyer.

94.    In April 2014, Meyer began highlighting in these newsletters what he

called "Class A1" shares.  Undisclosed to investors was that Class A1 shares were

hypothetical and not available to investors.  Meyer calculated the return of Class

A1 shares by supposing a $1,000 investment in Class A shares, taking a loan from

Arjun for the same amount, and reinvesting that loan's proceeds in additional Class

A shares to generate for the hypothetical investor 2 to 1 leverage.

95.     None of this was disclosed to Arjun investors in discussions of the

performance of Class A1 shares in his newsletters.  Instead, Meyer regularly

highlighted the performance of Class A1 shares in his newsletters to existing and

prospective Arjun investors.

96.     For example, in a newsletter touting 2015 third quarter results, Meyer

claimed that Class A1 shares had achieved a year-to-date return through August of

+14.2% (a percentage that approximately doubled Class A's +6.9% return over the

same period).  But this was highly misleading considering the Fund's actual year-

to-date return in August 2015 was roughly -10%.

97.     Various performance results for the Class A1 shares were also

presented during much of the Relevant Period in a chart on Statim's website.  In

2015, this chart showed the growth of a $1 million investment in Class A1 between

July 2013 and January 2015 and claimed that such an investment would roughly

triple to nearly $3 million during that year and a half period.

98.     Third, in some instances Statim and Meyer simply concocted numbers that had no apparent connection to any share class and then reported these exaggerated returns to investors in the newsletters.

99.     For example, Statim and Meyer circulated a newsletter for August 2014 that reported monthly and year-to-date returns for the Class A1 shares of +17.8% and +75%, respectively.  That newsletter also stated "[f]or the year, Arjun R has outperformed the S&P500 by 118% while ***Arjun A1 is leading the benchmark by 789%***." (Emphasis in original.)

100.    Meyer repeated similar false claims a few months later in November 2014, when he reported a year-to-date return for the "Class A1" of 91%.

101.    Neither his claims in August 2014 nor those in November 2014 were true.  Fund records reveal Class A year-to-date returns through November 2014 of approximately 12.5%, which if hypothetically doubled for the supposed Class A1 return, would yield only a return of roughly 25%.  Hence, Meyer exaggerated falsely a rate of return that was itself false and misleading.

   *(iii)    Misstatements Regarding Arjun's Assets under Management*

102.    Since at least August 2013, Meyer has told some investors and potential investors that Statim's AUM was several hundreds of millions of dollars, and other investors that the AUM was over one billion dollars.

103.   For example, in July 2015, Meyer told a prospective investor that Statim's AUM was $1.8 billion.  Prior to making a multi-million dollar investment, this investor asked via email for Meyer to confirm the $1.8 billion number, as he had seen a disclosure from 2011 stating that the AUM was only $13.7 million.

104.   Meyer replied by stating that the lower number was for "employees" and that it did not "report trust/off shore."  During a conversation with that investor, Meyer, in an apparent attempt to emphasize the size of the Fund, stated that he traded approximately $48 million in securities *every forty-five minutes*.  But Arjun's brokerage statement, which Meyer received, shows that Meyer bought and sold $8.4 million and $9.6 million in securities, respectively, during *all of July 2015*.  And, as of July 31, 2015, Statim's only significant managed account was Arjun, and, according to the records of its fund administrator, to which Meyer had access, Arjun's NAV was only $20.9 million.

105.   Later, in 2016, Meyer misrepresented Arjun's AUM to Bloomberg, which resulted in Bloomberg publishing an article that overstated Arjun's AUM by nearly 826%.

106.   A Bloomberg analyst contacted Meyer in January 2016 to confirm Arjun returns that Meyer had earlier reported to Bloomberg on Arjun's behalf. During this conversation, Meyer told the analyst that Arjun's AUM was $338

million, a number Bloomberg subsequently reported in a February 23, 2016, Bloomberg article entitled, *The Top Performing Hedge Funds of 2015*, which included a chart ranking Arjun eighth among "2015's Top-Performing [Hedge] Funds with Between $250M and $1B in Assets" and identifying Arjun as having $338 million in AUM.

107.  However, Meyer knew, through his review of Arjun's monthly financial statements, that Arjun's AUM had never, in its history, exceeded an amount in the low $40 million range.

108.  Nevertheless, on March 14, 2016, Meyer sent to existing and prospective Arjun investors an email entitled "Bloomberg Ranks Arjun in Top 10 Globally," which highlighted and republished portions of the Bloomberg article. In particular, Meyer reproduced in this email an excerpt of the Bloomberg ranking table, which he highlighted by placing a bold red outline around the Arjun-specific information.  This excerpt also claimed that Arjun had returns of 62.2% and 23.8% for the years 2014 and 2015, respectively—a number that falsely overstated Arjun's actual results of approximately 16.7% and -7.7% for those periods.

D.    *Statim and Meyer Deceived Investors When Advising Them to Reinvest Loan Proceeds In the Fund*

109.  In addition to using Arjun loans improperly to reduce Statim's receivable due to Arjun, Meyer used the availability of Arjun loans to further

27

discourage investor redemptions.

110.   Specifically, starting in mid-2015 at the latest, Meyer engaged in efforts to have investors borrow back from the Fund all or a portion of their investment and re-invest those loan proceeds in Arjun in order to increase the value of their account.

111.   In soliciting these loans, Meyer told some investors that, even though he or she would need to pay interest on the loan at a rate set by Meyer (which the investor could credit against his or her rate of return), the investor would nevertheless come out ahead because the reinvestment of the loan proceeds would increase their rate of return from Arjun and more than compensate for the interest on the loan.

112.   With other investors, Meyer knowingly downplayed that the additional investment was actually a loan, telling these investors that the additional amount added to the account was "Arjun's money" and had been placed in the investor's Arjun account as an additional benefit to the investors.

113.   Investors' borrowing back principal and reinvesting that principal in Arjun had the practical effect of preventing investors from making redemptions from Arjun due to the 50% redemption penalty—a consequence of which Meyer was aware but never disclosed when soliciting the loans.  Borrowing and re-

investing also had the effect, similarly not disclosed by Meyer, of diluting the returns of other, non-borrowing investors.

114.   When an investor borrowed back and reinvested loan proceeds in Arjun, no cash changed hands.  Instead, Meyer accounted for the transaction by book entry.  For instance, a $100,000 investment was simply doubled on Arjun's books, with the second $100,000 recorded as a credit to equity and a debit to assets for the receivable from the investor.  Since the now-leveraged shares provided no new funds to increase trading profits, the reinvested loan diluted other investors in the Fund by diverting monthly income away from non-leveraged investors, especially the Class R share interests, and toward the leveraged Class A investors and, by implication, towards Meyer due to his and Statim's retention of 50% of the profits of Class A shares.

115.   Moreover, although the newly leveraged Class A shareholder earned a greater return, he or she was effectively locked in as an investor to the Fund.  This was because Meyer applied the 50% redemption fee applicable to Class A shares to both the investor's initial principal and the loan amount.  Therefore, if an investor invested $100,000 into Arjun and increased his investment to $200,000 by a loan, the investor would have been required by Meyer to pay a redemption fee of 50% of the $200,000—an amount equal to his original investment and thereby changing a

50% redemption fee into a 100% redemption fee.

116.   If interest on the loan had accrued, the investor would receive nothing back of their investment and be *required to pay money to Statim* for the redemption.  A similar effect occurred if, at his discretion, Meyer called a loan, *i.e.*, Meyer would apply the 50% redemption penalty and subtract 50% of the loan value from the investor's principal.

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

117.   Paragraphs 1 through 116 are hereby re-alleged and are incorporated herein by reference.

118.   Defendants, in the offer and sale of securities described herein, by the use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes, and artifices to defraud, all as more particularly described above.

119.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts, and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Defendants acted with scienter, that is, with intent to deceive, manipulate or defraud or with

30

severely reckless disregard for the truth.

120.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77a(q)].

## COUNT II – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

121.   Paragraphs 1 through 116 are hereby re-alleged and are incorporated herein by reference.

122.   Defendants, in the offer and sale of securities described herein, by the use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

    a.   obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b.   engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

123.   By reason of the foregoing, the Defendants, directly and indirectly, violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) & 77q(a)(3)].

## COUNT III – AIDING AND ABETTING FRAUD

### Aiding and Abetting Violations of Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

124.   Paragraphs 1 through 116 are hereby re-alleged and are incorporated herein by reference.

125.   Defendant Meyer aided and abetted the violations of Sections 17(a) of the Exchange Act [15 U.S.C. § 77q(a)] by Defendant Statim by knowingly or recklessly providing substantial assistance to Statim who, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

     a.   employed devices, schemes and artifices to defraud purchasers of such securities;

     b.   obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were

made, not misleading; and

     c.     engaged in transactions, practices and courses of business

which would and did operate as a fraud and deceit upon the purchasers of

such securities,

all as more particularly described above.

126.   By reason of the foregoing, Defendant Meyer, directly and indirectly,

aided and abetted and, unless enjoined, will continue to aid and abet violations of

Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT IV – FRAUD

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

127.   Paragraphs 1 through 116 are hereby re-alleged and are incorporated

herein by reference.

128.   Defendants, in connection with the purchase and sale of securities

described herein, by the use of the means and instrumentalities of interstate

commerce and by use of the mails, directly and indirectly:

     a.     employed devices, schemes, and artifices to defraud,

     b.     made untrue statements of materials fact(s) and omitted to state

material fact(s) necessary in order to make the statements made, in the light

of the circumstances under which they were made, not misleading, or

      c.     engaged in acts, practices, and courses of business which

operated and would operate as a fraud or deceit upon persons,

all as more particularly described above.

129.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Defendants acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

130.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### COUNT V – AIDING AND ABETTING FRAUD

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder
[17 C.F.R. § 240.10b-5]**

131.   Paragraphs 1 through 116 are hereby re-alleged and are incorporated herein by reference.

132.   Defendant Meyer aided and abetted Defendant Statim's violations of

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by knowingly or recklessly providing substantial assistance to Statim, who, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

        a.     employed devices, schemes, and artifices to defraud;

        b.     obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

        c.     engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

133.   By reason of the foregoing, Defendant Meyer, directly and indirectly, aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a),(c)].

## COUNT VI – FRAUD

### Violations of Section 206(1) of the Advisers Act
### [15 U.S.C. § 80b-6(1)]

134.   Paragraphs 1 through 116 are hereby re-alleged and are incorporated herein by reference.

135.   Defendants, acting as investment advisers, by use of the mails or means or instrumentalities of interstate commerce, directly and indirectly employed devices, schemes, and artifices to defraud clients and prospective clients, all as more particularly described above.

136.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.  In engaging in such conduct, Defendants acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

137.   By reason thereof, Defendants violated and, unless enjoined, will continue to violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT VII – FRAUD

### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]

138.   Paragraphs 1 through 116 are hereby re-alleged and are incorporated herein by reference.

139.   Defendants, acting as investment advisers, by use of the mails or means or instrumentalities of interstate commerce, directly and indirectly engaged in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients, all as more particularly described above.

140.   By reason thereof, Defendants violated and, unless enjoined, will continue to violate Section 206(2) of the Advisers Act  [15 U.S.C. § 80b-6(2)].

## COUNT VIII – AIDING AND ABETTING FRAUD

**Aiding and Abetting Violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) & (2)]**

141.   Paragraphs 1 through 116 are hereby re-alleged and are incorporated herein by reference.

142.   Defendant Meyer aided and abetted Defendant Statim's violations of Sections 206(1) and (2) of the Advisers Act by knowingly or recklessly providing substantial assistance to Statim who, by use of the mails or means or instrumentalities of interstate commerce, directly and indirectly,

   a.   employed devices, schemes, and artifices to defraud clients and prospective clients; and

   b.   engaged in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients,

37

all as more particularly described above.

143.   By reason of the foregoing, Defendant Meyer, directly and indirectly, aided and abetted and, unless enjoined, will continue to aid and abet violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) & (2)].

## COUNT IX – FRAUD

### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder [15 U.S.C. § 80b-6(1) and 17 C.F.R. § 275.206(4)-8]

144.   Paragraphs 1 through 116 are hereby re-alleged and are incorporated herein by reference.

145.   By engaging in the conduct described above, Defendants, while acting as an investment adviser to a pooled investment vehicle, by use of the means and instrumentalities of interstate commerce and of the mails,

a.     made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in the pooled investment vehicles; and

b.     engaged in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative with respect to investors and prospective investors in pooled investment vehicles,

as more particularly described above.

146.   By reason thereof, Defendants violated and, unless enjoined, will continue to violate Section 206(4) of the Advisers Act  [15 U.S.C. § 80b-6(1)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder.

## COUNT X – AIDING AND ABETTING FRAUD

**Aiding and Abetting Violations of Section 206(4) of the Advisers Act
and Rule 206(4)-8 Thereunder
[15 U.S.C. § 80b-6(1) and 17 C.F.R. § 275.206(4)-8]**

147.   Paragraphs 1 through 116 are hereby re-alleged and are incorporated herein by reference.

148.   Defendant Meyer aided and abetted Defendant Statim's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder by knowingly or recklessly providing substantial assistance to Statim who, while acting as an investment adviser to a pooled investment vehicle, by use of the means and instrumentalities of interstate commerce and of the mails,

   a.   made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in the pooled investment vehicles; and

   b.   engaged in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative with respect to investors and

prospective investors in pooled investment vehicles,

as more particularly described above.

149.   By reason thereof, Defendant Meyer has aided and abetted and, unless

enjoined, will continue to aid and abet violations of Section 206(4) of the Advisers

Act  [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8]

thereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully prays for:

### **I.**

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal

Rules of Civil Procedure, finding that the Defendants named herein committed the

violations alleged herein.

### **II.**

Permanent injunctions enjoining Defendants from violating, directly or

indirectly, or aiding and abetting violations of the Section 17(a) of the Securities

Act [15.U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 206(1), 206(2),

and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1),(2) and (4)] and Rule

206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## III.

An order requiring an accounting by Defendants of the use of proceeds of the fraudulent conduct described in this Complaint and the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## IV.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against Defendants.

## V.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated this 26th day of December, 2018.

Respectfully submitted,

*/s/ M. Graham Loomis*

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Tel: (404) 842-7622
Email: loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
Georgia Bar No. 759054
Tel: (404) 842-7655
Email: murnahank@sec.gov

COUNSEL FOR PLAINTIFF
Securities and Exchange Commission
Atlanta Regional Office
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, GA  30326-1382
Tel (main): (404) 842-7600
Fax: (703) 813-9364